## McCALMONT v. PENNSYLVANIA CO.

(District Court, N. D. Ohio, E. D.   April 18, 1921.)

No. 10502.

1. **Master and servant** ⬳129(6)—**Causal connection between injury and violation of Safety Appliance Act essential.**

While the Safety Appliance Acts (Comp. St. § 8606 et seq.) are intended for the protection of all employés, and not solely to prevent the necessity for men to go between the ends of cars to make uncouplings, to render a railroad company liable for injury to an employé thereunder, there must be a causal connection in a legal sense between the violation of the act and the injury.

2. **Master and servant** ⬳111(1½), 247(5)—**Injury by cars without coupler required by federal act held not actionable.**

A car made defective by loss of a coupler was second of a number of cars standing on a storage track used solely for crippled cars, collected thereon for removal to the repair shop. It was necessary to improvise couplings before the cars could be moved, and plaintiff's intestate was an inspector in charge of such work. With an assistant he went between the first and second cars to shorten a chain coupling made by others, without first putting out a blue flag, as expressly required by the rules of the company, and while there the cars were driven together by another car kicked on the track, and by reason of the absence of the coupler he was killed. *Held*, that the railroad company was not liable under Safety Appliance Act, § 4 (Comp. St. § 8621), because (1) it was not "using, hauling, or permitting to be used or hauled on its line" the defective car at the time of the injury; and (2) the defective condition of the car was not the proximate cause of the injury, which was the negligence of deceased in failing to put out the warning flag.

At Law. Action by Dolly McCalmont, administratrix, against the Pennsylvania Company. Judgment for defendant.

D. F. Anderson (of Anderson, Lamb & Osborne), of Youngstown, Ohio, for plaintiff.

Thos. M. Kirby (of Squire, Sanders & Dempsey), of Cleveland, Ohio, for defendant.

WESTENHAVER, District Judge.   [1] At the conclusion of all the testimony, defendant moves the court to direct a verdict in its favor. This motion is based on the ground that defendant's car, alleged to be defective within the prohibition of the Safety Appliance Act, was not at the time in use within the meaning of that act, and also that the defective condition of the car was not in a legal sense the proximate cause of the death of plaintiff's decedent. The questions of law raised by this motion are much disputed by lawyers and cannot be said to be fully settled by decision. I have been called upon to deal with these questions in a number of cases, have read and reread the United States Supreme Court cases cited by counsel as pertinent or controlling, and it may therefore be helpful to counsel, not only in this but in other cases, if I review fully the law as I understand it.

The federal Safety Appliance Act of 1893, in section 2 (Comp. St. § 8606), provides:

"On and after the 1st day of January, 1898, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

It will be observed that the prohibition of this section is against hauling or permitting to be hauled, or used, on its line, any car not thus equipped.

The amendment of 1910, in section 4 (Comp. St. § 8621), provides:

"Any common carrier subject to this act, using, hauling, or permitting to be used or hauled on its line, any car subject to the requirements of this act, not equipped as provided in this act, shall be liable to a penalty of $100 for each and every such violation."

The criminal offense thus created is "using, hauling, or permitting to be used or hauled on its line." The word "permitting" was evidently inserted to meet the case of one interstate carrier receiving cars from another line, not thus equipped, and hauling them on its own line. Then follows a proviso in this section which says:

"Where any car shall have been properly equipped as provided in this act and the other acts mentioned herein, and such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired, without liability for the penalties imposed by [this] section, * * * if such movement is necessary to make repairs and such repairs cannot be made except at such repair point."

The penalties referred to therein are obviously the criminal penalties imposed by that section. It may be removed, without liability for such penalties, to the nearest available repair point, but only in the event such repairs cannot be made where the car becomes defective or insecure. Then follows the provision relied on by plaintiff, with reference to the civil liability. It is in these words:

"And such movement or hauling of such car shall be at the sole risk of the carrier, and nothing in this section shall be construed to relieve such carrier from liability in any remedial action for the death or injury of any railroad employé caused to such employé by reason of or in connection with the movement or hauling of such car with equipment which is defective or insecure or which is not maintained in accordance with the requirements of this act and the other acts herein referred to."

There is also a further proviso, in these words:

"And nothing in this proviso shall be construed to permit the hauling of defective cars by means of chains instead of drawbars, in revenue trains or in association with other cars that are commercially used, unless such defective cars contain live stock or 'perishable' freight."

These prohibitions of the Safety Appliance Act, as I understand them, are against the hauling, using, or permitting to be used or hauled, any car not thus equipped. The permission to haul from the place where the want of repair is discovered is a permission to haul it only to the nearest available repair place, and only in case it is necessary to do such hauling in order to make repairs, and when they cannot be made except at that repair place. Even this permission to haul to the near-

est available repair place does not permit the hauling of defective cars by chains instead of drawbars in association with other cars commercially used, unless such defective car contains live stock or perishable freight. Obviously this means that crippled cars must be hauled in trains made up exclusively of crippled cars. The association of the word "used" with the words "hauled or permitted to be hauled on its line" clearly indicates that the use must be associated with or related to the transportation or hauling of a crippled car, either in transportation from place to place, or of the car from the place where found to be defective or insecure to the place of repair. It does not mean such use of the car elsewhere or in other relations than such hauling or movement.

Obviously cars have to be equipped somewhere with safety appliances. Obviously, if they are once equipped and get out of repair, they must be repaired somewhere. It could not be contemplated that cars could be either constructed or equipped in such a manner as never to become defective or insecure or out of repair. The act of repairing or putting the crippled car in condition for transportation to a repair point is a different matter, as I understand it, from the using, hauling, or permitting to be used or hauled, upon its line, by the carrier, of a car not properly equipped as is required by the Safety Appliance Act, or becoming out of repair after being once equipped. It is only when the use is in connection with the movement or hauling of the car in the forbidden manner that the Safety Appliance Act can be said to apply. Injuries sustained under other conditions and in other situations are controlled by the negligence rules provided in the federal Employers' Liability Act of April 22, 1908 (U. S. Compiled Statutes, §§ 8657–8665).

Undoubtedly border line cases will arise. It will be difficult at times to say whether the car was thus in use or out of use. The work being done by an employé on that crippled car may be so intimately connected with the intended or contemplated movement or hauling of the car as to be a part of such movement; and other cases will arise in which the same will be so remote as not to be a part thereof. In that situation, the rules established by the decisions for determining when an employé was engaged in interstate transportation, or in work so closely related thereto as to be practically a part thereof, may by analogy furnish a standard whereby this question may be solved. See Pedersen v. Delaware, etc., R. R. Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153; Roush v. B. & O. R. R. Co. (D. C.) 243 Fed. 712.

But, assuming the Safety Appliance Act applies to the situation, the question arising is whether the defect complained of is a proximate cause of the employé's injuries. This question is very perplexing. In determining it we have the assistance of several decisions of the United States Supreme Court, and I believe it will aid to an understanding of the law if I should review each of those cases. I have read them many times in the past, and during the noon recess have again reread them all.

The first in time, if not in importance, is St. Louis & San Francisco Railroad Co. v. Conarty, 238 U. S. 243, 35 Sup. Ct. 785, 59 L. Ed. 1290. In that case the injured employé sustained his injuries as the result of a collision between a switch engine and a loaded freight car having no coupler or drawbar at one end, which drawbar had been pulled out by the cars in transit. This crippled car was about to be placed on an isolated track for repair, and during the movement was left near a switch leading to that track, while other cars were being moved out of its way. This task would have taken about five minutes. While the crippled car was standing there, a switch engine, having nothing to do with the movement of the crippled car, or with the movement of the other cars which had to be taken out of its way, came along and collided with it; in other words, there was a collision between the switch engine, independently operated, and the crippled car standing upon the track. Conarty and two other fellow employés were riding on the forward end of the switch engine that bumped into the crippled car. His fellow employés, one on one side and one on the other, both stepped from the engine and escaped injury; but he was caught between the switch engine and the crippled car and thus sustained his injuries. The holding was that the violation of the Safety Appliance Act and the movement of the car in this manner was not a proximate cause of the injury to the employé. In the opinion, delivered by Mr. Justice Van Devanter, it is said:

"Had these appliances [the coupler and drawbar of the defective car] been in place, they, in one view of the evidence, would have kept the engine and the body of the car sufficiently apart to have prevented the injury; but in their absence the engine came in immediate contact with the sill of the car with the result stated."

And further:

"It is not claimed, nor could it be under the evidence, that the collision was proximately attributable to a violation of those provisions, but only that, had they been complied with, it would not have resulted in injury to the deceased."

As I understand that statement of the law, it is that the deceased would not have been injured, had the drawbar or coupler been in place on the crippled car, but that their absence was not what in law is called a proximate cause of the injury. Mr. Justice Van Devanter, after reviewing the provisions of the Safety Appliance Act and its objects and purposes, further says:

"Nothing in either provision gives any warrant for saying that they are intended to provide a place of safety between colliding cars. On the contrary, they affirmatively show that a principal purpose in their enactment was to obviate 'the necessity for men going between the ends of the cars.' We are of opinion that the deceased, who was not endeavoring to couple or uncouple the car, or to handle it in any way. but was riding on the colliding engine, was not in a situation where the absence of the prescribed coupler and drawbar operated as a breach of a duty imposed for his benefit."

It obviously follows that the proximate cause in that case must be found in the negligence of the persons operating the switch engine which ran into the crippled car, or in the negligence of the other employés,

who left the crippled car in that situation without giving proper notice or warning to the crew operating the switch engine. In that view of the law, the crippled car was a condition, but not a cause, of the accident.

In Great Northern Railway Co. v. Wiles, 240 U. S. 444, 36 Sup. Ct. 406, 60 L. Ed. 732, the employé who was killed was the flagman or rear brakeman, whose duty it was, under the rules, whenever his train came to a stop upon the tracks, to go back with a flag and protect the rear of the train. The train on which he was employed had come to a halt upon the track as a result of the train separating or pulling apart because of a defective coupler or drawbar. Wiles, instead of going back to protect the rear of the train, remained with the conductor in the caboose, for some reason unknown and unexplained, and a train following close behind ran into the caboose and killed both Wiles and the conductor. No negligence was attributable to the engineer or employés of the following train. A recovery was denied on the ground that the flagman's negligence was the sole proximate cause of his death, from which the corollary follows that the violation of the Safety Appliance Act, which permitted the train to become uncoupled while in use, was a remote cause of the injury.

The first headnote sums up the reasoning of the opinion correctly in these words:

"Where there is nothing to extenuate the negligence of the employé, or to confuse his judgment, and his duty is as clear as its performance is easy, and he knows not only the imminent danger of the situation, but also how it can be averted by complying with the rules of the employer, there is no justification for a comparison of negligences on the part of the employer and employé, or the apportioning of their effect under the provision of the Employers' Liability Act. To excuse such neglect on the part of an employé of an interstate carrier would not only cast immeasurable liability on the carriers, but remove security from those carried."

As counsel well know, it was in part upon the authority of the Wiles Case that I held no liability existed in the Copeland Case, and my judgment in the Copeland Case has since been sustained by the Circuit Court of Appeals. See 269 Fed. 361.

In Minneapolis & St. Louis R. R. Co. v. Gotschall, 244 U. S. 66, 37 Sup. Ct. 598, 61 L. Ed. 995, the question, mooted, but left undecided, in the Wiles Case, again arose and was decided, namely, whether or not an inference is to be drawn of a violation of the Safety Appliance Act from the mere fact that the automatic coupler on the train pulls apart while the train is being hauled. There was no proof offered of a failure to observe the act, except that one of the couplers had pulled open, permitting the train to separate. The doctrine of res ipsa loquitur was applied. That case was followed by me and applied in what is known as the Caldwell Case, and my judgment was again affirmed by the Circuit Court of Appeals. See 264 Fed. 947.

The next case of importance is Louisville & Nashville R. R. Co. v. Layton, 243 U. S. 617, 37 Sup. Ct. 456, 61 L. Ed. 931. It is this case which has been making for confusion in the minds of the legal profession and has been taken as modifying, if not overruling, the doctrine of the Conarty Case. Upon the facts, the case is comparatively simple,

and scarcely requires to be distinguished from the Gotschall or Cald-well Cases. The facts were these:

A number of cars were standing upon a track about two car lengths from five other cars on the same track. An engine, pushing one stock car ahead of it, came through the switch and attempted to couple by impact to these five cars. It struck with such force that the five loaded cars were driven over the intervening two car lengths of space, and collided so violently with the other cars standing on the track that the plaintiff, who was on one of the five cars for the purpose of releasing the brakes, was thrown to the ground and injured. The engine, with the stock car attached, stopped within a half a car length after the impact. The stock car failed to couple automatically with the five cars, as was contemplated by the switching movement, owing to the fact that the stock car was not equipped with automatic couplers which would couple by impact, as is required by the law.

The question discussed in the opinion is as to whether the failure to comply with the Safety Appliance Act was a proximate cause of the injury. Upon the facts as I have stated them, it is, as I have said, diffi-cult to see any difference between them and the facts of the Gotschall Case or of the Caldwell Case. In the Gotschall Case the train broke in two, owing to a defective coupler, and Gotschall, being on that train in the performance of his duty, was thrown to the ground and injured. In the Caldwell Case the train likewise broke in two for the same reason, and Caldwell either was on or had ascended the runaway cars, and was trying to stop them when they collided with other cars, throw-ing him to the ground. In the Layton Case the injured employé was on one of the five cars for the purpose of releasing the brakes as a part of the hauling movement in contemplation at the time the effort to couple automatically was attempted.

Thus we see that the facts are quite narrow, and it also seems to me that the broad inference, drawn from the language used in the opinion, that an interstate carrier is liable under any and all circum-stances to an injured employé working in and about a crippled car, cannot be sustained. Mr. Justice Clarke was distinguishing the narrow language which had been used in the Conarty Case. As a result of that language some members of the legal profession were asserting that the automatic coupling requirement was designed for the benefit and protection only of persons required to go between the cars to make coup-lings, and was not for the benefit and protection of employés in other situations, injured as a result of the failure to comply with such provi-sions. In view of the absolute duty thus to equip cars, and the absolute liability imposed for hauling cars not thus equipped, obviously all em-ployés are and were intended to be within its beneficent provisions. It was this view that Mr. Justice Clarke was emphasizing, and his lan-guage is not to be taken as modifying the fundamental rule that a causal relation between the violation of the Safety Appliance Act and the em-ployé's injuries must always exist.

That this was the Supreme Court's understanding of the decision in the Layton Case is made clear by its recent decision in Lang v.

New York Central R. Co., 255 U. S. ——, 41 Sup. Ct. 381, 65 L. Ed. ——, decided March 28, 1921. In this case the court's understanding of the Layton Case and of the rules of law under consideration is made much clearer by the dissenting opinion of Mr. Justice Clarke, concurred in by Mr. Justice Day. Plaintiff here, in effect, bases his right to recover upon the law stated in this dissenting opinion, and not upon the law, as I understand it, pronounced in the court's opinion. The Lang Case must be taken as controlling, not only because it is the latest expression of that court, the decisions of which we are bound to follow, but also because of the careful review of the earlier cases.

Upon the facts, the court say it is not in conflict with the Layton Case. Briefly stated, the facts were that at a place called Silver Creek there were some 11 cars in the yard upon a side track. The train crew, of which Lang was a member, had orders to pick up at Silver Creek one of these cars destined for Farnham, and, in the opinion, called the Farnham car. When Silver Creek was reached, the conductor of the train and Lang, one of the brakemen, on looking for the Farnham car, found it was practically in the middle of a string of 11 cars, one of which, next to it, was a car from which the drawbar was missing. In order to get out the Farnham car, it was necessary to pull out the six cars, of which the Farnham car was farthest from the end and next to the crippled car. This was done, and after the Farnham car had been set out upon the track, where it might later be picked up, the engine switched two of the remaining cars on the one side track, and kicked the three remaining cars back again onto the track from which they had been taken, and where the crippled car was standing. Lang, the brakeman, was on the rear end of that one of these three cars next to the crippled car, and had gotten there in the line of his duties for the purpose of setting the brakes and stopping it before it came into contact with the crippled car. Owing to some miscalculation, whether of a defective brake, or whether he failed to apply the brake soon enough, or some other cause not made apparent, the car upon which he was riding was not stopped as had been contemplated by him, but ran into and collided with the crippled car. He was standing with one foot down on the brake step, and, owing to the absence of the drawbar, the two cars came so close together that his leg was caught between the two, and he was so crushed that death resulted.

The question disputed was whether or not the case came within the Conarty or the Layton Case. On this point the Appellate Division of the Supreme Court of New York (187 App. Div. 967, 175 N. Y. Supp. 908) held that it came within the Layton Case. Upon appeal, the Court of Appeals (227 N. Y. 507, 125 N. E. 681) reversed the judgment of the trial court and of the Appellate Division, and directed the complaint be dismissed, because that court was of the opinion that it fell within the Conarty Case. The opinion of the United States Supreme Court, delivered by Mr. Justice McKenna, says:

"Two questions are hence presented for solution: (1) Was the Court of Appeals estimate of the Conarty Case correct? (2) Was it properly applied to Lang's situation?

"(1) The court's conclusion that the requirement of the Safety Appliance Act 'was intended to provide against the risk of coupling cars' is the explicit declaration of the Conarty Case. There, after considering the act and the cases in exposition of it, we said: 'Nothing in its provisions "gives any warrant for saying that they are intended to provide a place of safety between colliding cars. On the contrary, they affirmatively show that a principal purpose in their enactment was to obviate the necessity for men going between the ends of the cars."' * * * The case was concerned with a collision between a switch engine and a defective freight car, resulting in injuries from which death ensued: The freight car was about to be placed on (we quote from the opinion) 'an isolated track for repairs, and was left near the switch leading to that track while other cars were being moved out of the way—a task taking about five minutes. At that time a switch engine with which the deceased was working came along the track on which the car was standing and the collision ensued.' The deceased was on the switch engine, and it was on its way 'to do some switching at a point some distance beyond the car and was not intended and did not attempt to couple it to the engine or to handle it in any way. Its movement was in the hands of others.'

"(2) That case. therefore, declares the same principle of decision as the Court of Appeals declared in this. and, while there is some difference in the facts, the difference does not exclude the principle. In neither case was the movement of the colliding car directed to a movement of the defective car. In that case the movement of the colliding car was at night, and it may be inferred that there was no knowledge of the situation of the defective car. In this case the movement of the colliding car was in the daytime, and the situation of the defective car was not only known and visible, but its defect was known by Lang. He therefore knew that his attention and efforts were to be directed to prevent contact with it. He had no other concern with it than to avoid it. 'It was not,' the trial court said, 'the intention of any of the crew [of the colliding car] to disturb, couple onto, or move the crippled car.' It was the duty of the crew. we repeat. and immediately the duty of Lang, to stop the colliding car and to set the brakes upon it. 'so as not to come into contact with the crippled car,' to quote again from the trial court. That duty he failed to perform, and, if it may be said that notwithstanding he would not have been injured, if the car collided with had been equipped with draw bar and coupler, we answer, as the Court of Appeals answered, 'Still the collision was not the proximate result of the defect'; or, in other words, and as expressed in effect in the Conarty Case, that the collision under the evidence cannot be attributable to a violation of the provisions of the law, 'but only that, had they been complied with, it [the collision] would not have resulted in the injury to the deceased.' "

Little or nothing can be profitably added by me. However, it may be said that the defective car might be regarded as in use, so as to bring it within the Safety Appliance Act. It was not standing on a dead track, or repair track, for the purpose of being hauled to a place of repair, or of being put into shape that it might thus be hauled. It was and had been mixed with sound cars and shifted about the yard from day to day preparatory to being unloaded. In this respect, the tacit assumption is that the defective car was hauled, or permitted to be hauled, or used, on the line of an interstate carrier. The decision is rested on the ground that there was no causal connection, in a legal sense, between the violation of the Safety Appliance Act and the injury. In this view the defect, as well as the presence of the defective car, was a condition of the injury, and not a proximate cause of the injury.

[2] Let us apply the rules of law and these authorities to the facts of this case. The defective car was standing with some six other cars

on track 444. This was a storage track for crippled cars, upon which were placed cars found to be defective and in need of repair, and was used for no other purpose. They were removed from that track once or twice every 24 hours by a separate engine in a separate train to a repair shop some 2,000 or 3,000 feet distant. After crippled cars were thus placed on this dead track, it became and was necessary to make improvised couplings, by chains or otherwise, in order that they might thus be moved. The car in question was the second from the east end of a string of six, and had been placed there some time between 12 o'clock midnight and 6:30 in the morning of the accident, and some one, during the same period, had made a chain coupling of the car in question to the end car. Plaintiff's decedent, Newell J. McCalmont, was a car inspector, boss, or foreman. At some time during the forenoon of the day, some witnesses say about 8 o'clock and others about 10, he was making an inspection of these cars, accompanied by an assistant by the name of Joseph Robassi. It was a part of his duties to inspect these six cars, and it may be assumed that it was also a part of his duties either to make improvised couplings or to cure any defects or insufficiencies which might appear in such as were already made as a result of his inspection. Coming to the car in question, he observed to his assistant that there was too much slack in the chain coupling, and announced that they would go between the cars and correct it. At this juncture his assistant, Robassi, called his attention to the fact that there were no blue flags out to protect the string of cars standing on this dead track; but, in disregard of this warning, the deceased proceeded with the work, giving instructions to his assistant to follow him. They went between the cars and were engaged in remaking the chain coupling, when another car, kicked onto this track from the yard, collided with the end of the string and crushed McCalmont between the two cars, causing his death.

The evidence is clear that this string of cars was not protected by a blue flag and that the colliding car was merely being set in upon this same track as the other cars had already been set there, and for the same purpose. The crew of the engine thus setting it in are not shown to be the crew or engine which would at some later period move these cars to the repair shop, and were not contemplating at the time moving the string of six cars, or, indeed, driving the car into contact with them. In other words, there is no evidence tending to show negligence under the federal Employers' Liability Act, but the plaintiff can recover, if at all, only because of the violation of the federal Safety Appliance Act. The rules of the company, introduced in evidence, bearing on the situation, are 26 and 723. Rule 26 provides:

"A blue flag by day and a blue light by night, placed at one or both ends of an engine, car, or train, indicate that workmen are under or about it; when thus protected, it must not be coupled to or moved. Workmen will display the blue signal, and the same workmen are alone authorized to remove them. Other cars must not be placed on the same track, so as to intercept the view of the blue signals without first notifying the workmen."

Rule 723 provides:

"The car inspector, in the absence of a foreman, will perform the same duties as the foreman in the district assigned to him. When inspecting or repairing cars, he must protect himself by displaying the blue signals as prescribed by rule 26."

It was these rules which the assistant, Robassi, had in mind when he called the attention of the decedent to the absence of a blue signal immediately before the decedent went between the cars.

Upon these facts, is it not true that the Wiles Case is controlling? It seems so to me. The duty of McCalmont is clear; its performance was easy. There was nothing to extenuate his negligence or to confuse his judgment. He knew, not only the imminent danger of the situation, but also how to avert it by complying with the rules of the employer. It was his negligence which was the moving cause of the accident. The condition of the defective car must, in the light of the Conarty and the Lang Cases, be regarded, at most, only as a condition and not as a proximate cause, of the accident. For a discussion of proximate as distinguished from remote cause, see Railroad Co. v. Reeves, 10 Wall. 176, 19 L. Ed. 909; Scheffer v. R. R. Co., 105 U. S. 249, 26 L. Ed. 1070.

In addition thereto, it does not seem to me that the car which caused the injury was in use within the meaning properly to be given to that word under the Safety Appliance Act. The defendant was not hauling it, or permitting it to be hauled or used, on its line. It had taken it out of use and placed it on a dead track, and the hauling or the movement of it from that dead track to the repair place, which is permitted to be done only at the risk of the defendant, had not yet begun and was not then in immediate contemplation. What McCalmont was doing was not so intimately associated with, or related to, that hauling or movement as to be practically a part of it. He was merely making a temporary repair to the car upon the dead track, so that at some future time it might thus be moved or hauled. The law does not forbid or prohibit work in or about a car upon a dead track, so as to put it into condition thus to be moved or hauled; nor does the law impose an absolute liability upon the interstate carrier for injuries sustained by one engaged in doing that kind of work. In that situation, and while doing that kind of work, the applicable law, it seems to me, would be the negligence rules provided by the federal Employers' Liability Act, and not the absolute liability of the Safety Appliance Act.

For the foregoing reasons, I am of opinion that defendant's motion should be granted. An exception is allowed plaintiff.