BURMASTER

v.

T. & P.-M. P. TERMINAL R. R. OF

NEW ORLEANS

---

(April 11, 1927. Opinion and Decree.)
(May 23, 1927. Rehearing Refused.)
(July 12, 1927. Writ of Certiorari and Review Denied by Supreme Court.)

---

(*Syllabus by the Court*)

1. **Louisiana Digest—Evidence—Par. 59— Master and Servant—Par. 144.**

In order to recover damages for personal injuries in a suit against a carrier under the Federal Employers' Liability Act and the Federal Boiler Inspection Act plaintiff must show that the carrier's negligence contributed to cause the injury.

2. **Louisiana Digest—Master and Servant —Par. 144, 158.**

Where the circumstantial evidence is relied on to prove that the carrier's negligence was the proximate cause of the injury the circumstances themselves must be proved and not presumed.

3. **Louisiana Digest—Negligence—Par. 42, 43.**

A judgment for plaintiff in a case to recover damages for personal injury cannot be sustained where the record leaves the question of negligence uncertain.

Appeal from Twenty-fourth Judicial District Court, Parish of Jefferson. Hon. R. L. Rivarde, Judge.

Action by John J Burmaster against Texas & Pacific-Missouri Pacific Terminal Railroad of New Orleans.

There was judgment for plaintiff and defendant appealed.

Suit dismissed.

F. A. Middleton, Chas. J. Larkin, of New Orleans, attorneys for plaintiff, appellee.

Dufour & St. Paul, Jno. E. Fleury, of New Orleans, attorneys for defendant, appellant.

OPINION

JONES, J. This is a suit filed May 29, 1922, by a locomotive engineer for forty-three thousand, eight hundred fifty dollars ($43,850) damages for personal injury caused by explosion of his engine while engaged in interstate commerce and switching cars loaded with bananas from the yards of defendant in New Orleans to their transfer boat on the Mississippi River.

Defendant answered admitting the employment and the explosion but denying all negligence and especially averring that plaintiff's injuries were the result of his own gross carelessness, negligence and imprudence.

The case was tried before a jury on December 11th and 14th, 1925, and a verdict was given for the amount claimed.

On December 18th the judge of the lower court rendered judgment based on that verdict.

On January 11, 1926, the motion for new trial was refused in the following words:

"When after hearing the argument of counsel in this case and considering the pleadings filed herein, the court has come to the conclusion that the motion for a new trial should be refused. The court feels that in view of the fact that the Supreme Court has said that it will consider the facts in the case and the Court of Appeals has likewise said that it will consider the facts in the case, and I am of the opinion that in view of the fact that the jury has rendered the verdict as it did, after hearing the evidence, and also because this case will necessarily be reviewed by the Court of Appeals, that the trial should be refused and it is so ordered."

On January 13, 1926, a suspensive appeal was taken to this court.

The suit was brought under the Federal Employers' Liability Act, passed by Congress on April 22, 1908, C. 149, 35 Stat. 65, 66 (Comp. St. Par. 8569) and under the Federal Boiler Inspection Act of Congress of February 17, 1911, as amended March 4, 1915 (Comp. St. 8630-8639).

Paragraph VI of plaintiff's petition, the crucial paragraph in so far as this suit is concerned, reads as follows:

"That the explosion in said engine was caused by the gross fault, negligence and want of care of the Trans-Mississippi Terminal Railroad Co., its officers, agents and employees that the engine furnished petitioner was not safe or in good condition, but was defective, badly constructed and in need of repair; that the crown sheet was defective and not sufficiently strong to withstand the pressure of steam, and was not properly fastened that the boiler and injectors were in bad condition; that the water glass was in bad condition, and that the engine was not equipped with the necessary safety appliances or safeguards against accident as required by law; that defendant neglected to provide the said engine with the necessary appurtenances, and failed to take the usual and necessary steps to inspect and repair the same, although it knew or should have known the condition thereof; and that petitioner had no knowledge of the defective condition of said engine or of the neglect of defendant to keep the same in good condition, and was not guilty of any fault or negligence which in any manner contributed to the injuries suffered by him."

The following facts are undisputed:

1. That plaintiff, who had been employed by defendant company or its subsidiaries for fourteen years as fireman and eleven years as engineer, had had charge of Engine 319 for a period of thirty or thirty-five minutes when the boiler exploded about two o'clock on the morning of June 1, 1921, on the incline leading from the ferry boat to the railroad yard.

2. That he was discharged by the company on account of this explosion.

3. That his fireman, Israel, who had been employed by the company about four years at the time of the accident has been made an engineer and was still in the employ at the time of the trial.

4. That Engine 319 was taken out of the round house of the company by the hostler on the west bank of the river shortly after midnight with steam up; that the injectors and water glass were then in good condition and working properly; that the engine was brought by a switch engine to the ferry boat in charge of Charles Evans, engine watchman, a colored man who says that he opened the water glass at the bottom, turned the water out and then shut water off and the water came back in the glass showing two gauges of water; that Hostler Sims, who was on the engine at the time, turned on the right injector and he turned on the left; that he had been lighting fires at the roundhouse for five years.

5. Evans swears that you can see if an injector is not working by the way she primes and by the water flowing out-

side and the injector's kicking the steam back in the tank if "she isn't bringing up her water" and that on the way to the boat he had the injector on and was getting up steam; that he heard the water and the whistle and that she had water enough for two or three hours; that he put the fires out going down the incline and left the engine with 145 pounds of steam.

6. That the boat crossed the river with the engine and a yard master named Dawson, who was not in the employ of the company and did not testify at the trial, lighted the fire in the engine, hauled some cars off the ferry boat and placed the engine upon a side track in the yard.

7. That plaintiff then came up, tried his gauge cocks which showed two gauges of water and went around the engine with his oil can before he took charge of the engine; that he then did some switching, took hold of some cars to be placed on the transfer boat, and having lined them up, took them on the transfer boat and placed them in the proper position upon the boat and returned to a position near the office of the general yardmaster, where he remained about ten minutes; that he then switched another string of cars and took them down to the transfer boat and was returning up the incline leading from the transfer boat to the city yards when he first heard a sound like a bursted air hose and a second or two later an explosion occurred which blew him up against the top of the iron cab, after which he fell out upon the incline and across the iron rail, striking his leg upon the rail; that the explosion was attended with considerable gas, smoke, soot and brick dust from the broken fire box; that he inhaled considerable of this mixture and complained about it immediately afterward and while in the Presbyterian Hospital, where he was taken and remained for six days.

Although there are many charges of negligence and much evidence was taken in an attempt to sustain these charges, it was admitted by plaintiff's attorney after a detailed thorough argument in this court that the explosion was caused by letting the water get too low in the boiler and the issue was reduced to the cause of this scarcity of water.

Plaintiff's brief outlines the negligence charged as follows:

1st. Because Engine 319, which exploded, was equipped with a faulty water-glass designed for the information and protection of the engineer and fireman in charge of said engine, and which equipment, being faulty, supplied to the engineer and fireman false information; and with faulty injectors which failed to replenish the boiler when operated.

2nd. Because the said mechanism referred to in paragraph 1 was disarranged and made faulty and unreliable by the acts of one Evans, an ignorant negro, who was placed in charge of said engine from the time that it left the water tank in the Gouldsboro yards until it was placed upon the transfer boat for removal to the New Orleans side of the river.

3rd. Because said mechanism above referred to in paragraphs 1 and 2 was made faulty and unreliable and disarranged by one Dawson, yardmaster of the defendant company, in the city of New Orleans yards, who, without authority, and against the rules of the company, went upon the transfer boat when it landed on the New Orleans side of the river, built the fires in said engine, operated said engine and equipment, in moving five cars from said transfer boat and up to and into the said railroad yards, switching said cars upon one track and then cutting loose from said cars and proceeding up another track.

Defendant argues that the evidence shows the following facts:

1. That even if the water-glass was defective, which is denied, plaintiff paid

no attention to it, but relied entirely on his water gauges to test the amount of water and, therefore, the defect in the water-glass, if any, was not a contributing cause of the accident.

2. That the injectors were working properly and if they had not been carrying water into the boiler, plaintiff would necessarily have known.

On page six of his testimony, plaintiff says, "I tried the gauge cocks again and I asked him (the fireman) did you blow your glass out; he said 'I blew it out, but it didn't seem to be working.' I said 'don't depend on that glass with gauge cocks, the safe thing.'" And again on page eleven he says, "Your water-glass is not exactly the part to go by, because your gauge cock is the proper thing to go by. When you've not got the water in the gauge cocks you can't have it in the water-glass. I do not depend on the water-glass." And again on page twenty-six, "I stood there for ten minutes with both injectors working. I tried my gauge cocks again and said, "Day don't depend on the water-glass, I have got the gauge cocks that are safer; here are two gauges of water."

These above extracts from plaintiff's testimony show clearly that he did not rely on the water-glass, but on the water gauges.

In Chicago, M. & St. P. R. Co. vs. Coogan, 46 Sup. Court Reporter, p. 565, decided June 1, 1926, where a brakeman was killed while coupling the air hose of an interstate train and the Supreme Court of Minnesota had affirmed the judgment of the trial court, Justice Butler in a decision remanding the case uses the following words:

"By the Federal Employers' Liability Act, Congress took possession of the field of employers' liability to employees in interstate transportation by rail; and all state laws upon that subject were superseded. Second Employers' Liability Cases (Mondou vs. New York, N. H. & H. R. Co.) 223 U. S. 1, 55, 56 L. Ed. 327, 348, 38 L. R. A. (N. S.) 44, 32 Sup. Ct. Rep. 167, I. N. C. C. A. 875; Seaboard Air Line R. Co. vs. Horton, 233 U. S. 492, 501, 58 L. Ed. 1062, 1068, L. R. A. 1915 C. 1, 34 Sup. Ct. Rep. 635, Ann. Cas. 1915 B, 475, 8 N. C. C. A. 834. The rights and obligations of the petitioner depend upon that act and applicable principles of common law as interpreted by the Federal Courts. The employer is liable for injury or death resulting in whole or in part from the negligence specified in the act; and proof of such negligence is essential to recovery. The kind or amount of evidence required to establish it is not subject to the control of the several states. This court will examine the record, and if it is found that as a matter of law, the evidence is not sufficient to sustain a finding that the carrier's negligence was a cause of the death, judgment against the carrier will be reversed. St. Louis, I. M. & S. R. Co. vs. McWhirter, 229 U. S. 265, 277, 57 L. Ed. 1179, 1186, 33 Sup. Ct. Rep. 858; New Orleans & N. E. R. Co. vs. Harris, 247 U. S. 367, 371, 62 L. Ed. 1167, 1170, 38 Sup. Ct. Rep. 535; New Orleans & N. E. R. Co. vs. Scarlet, 249 U. S. 528, 63 L. Ed. 752, 39 Sup. Ct. Rep. 369."

"The evidence is sufficient to warrant a finding that there was a breach of duty in this respect. But the precise question for decision is whether the condition of the pipe caused or contributed to cause the death of deceased.

"Whenever circumstantial evidence is relied on to prove a fact, the circumstances must be proved and not themselves presumed. (U. S. vs. Ross, 92 U. S. 281, Manning vs. John Hancock Mut. Life Ins. Co., 100 U. S. 693.)

"A judgment for plaintiff in an action to recover damages for wrongful death cannot be sustained where the record leaves the question of negligence in the realm of speculation and conjecture."

In Copeland vs. Hines, 269 F. 363:

"A mere conjecture standing upon a basis of uncertain inference does not make substantial evidence."

And in St. Louis & San Francisco Ry Co. vs. Mills, 271 U. S. 344-70, Law Ed. 979, decided May 24, 1926, Justice Stone holds in part as follows:

"One seeking to recover damages for death of an employee because of neglect on the part of the employer to furnish adequate protection against the violence of strikers has the burden of proving the alleged negligence.

"Nor is there evidence from which the jury might infer that petitioner's failure to provide an additional guard or guards, was the proximate cause of decedent's death. Whether one or more additional guards would have prevented the killing is in the highest degree speculative. The undisputed evidence is that the shooting was done by one or more of three men standing on the rear platform of the car. They had come there after decedent and his companions had seated themselves in the car. Without warning they fired a volley into the car and fled. Decedent and his guard were armed, but had no opportunity to defend themselves. On such a state of facts the jury should have been permitted to conjecture what might have happened if an additional guard had been present. See Patton vs. Texas & Pac. R. Co., supra; Reading Co. vs. Boyer (C. A. 3d 6 F. (2d) 185; Midland Valley R. Co. vs. Fulgham, L. R. A. 1917 E. 1, 104 C. C. A. 151, 181 Fed. 91; Laidlaw vs. Sage, 158 N. Y. 73, 44 L. R. A. 216, 52 N. E. 679 (348). The evidence must at least point to the essential fact which the jury is required to find in order to sustain the verdict."

See also Long vs. N. Y. Central, 255 U. S. 455; L. & N. vs. Layton, 243 U. S. 617; Davis vs. Wolff, 263 U. S. 239.

As these decisions, the latest of the highest court, show clearly that the plaintiff must not only prove negligence but also that the negligence was the proximate cause of the accident, we conclude that plaintiff has failed to make out his case on this point.

In the case of Baltimore & O. R. Co. vs. Groeger, 266 U. S. 521, where a boiler had blown up and the widow of the engineer as administratrix of his estate brought suit under the 2 statutes relied on here, and the U. S. District Court for the Northern District of Ohio gave judgment for plaintiff and the judgment was affirmed by the Circuit Court of Appeals, Justice Butler uses the following language:

"It is a well-established rule that the master is not bound to furnish the latest or best tools or appliances for the use of his servants. That rule is applicable here, and we hold that defendant was not liable for failure to furnish the best mechanical contrivances and inventions or to discard appliances upon discovery of later improvements, provided the boiler was in proper condition and safe to operate, as required by the statute. Chicago & Northwestern Ry. Co. vs. Bower, 241 U. S. 470, 474, 36 S. Ct., 624, 60 L. Ed. 1107; Patton vs. Texas & Pacific R. R. Co., 179 U. S. 658, 664, 21 S. Ct., 275, 45 L. Ed., 361; Washington, Etc., Railway Co. vs. McDade, 135 U. S. 554, 570, 10 S. Ct., 1044, 34 L. Ed., 235."

This case shows that a mere boiler explosion does not prove negligence. Otherwise, the Supreme Court would not have remanded the case.

On the second question as to the injectors, plaintiff's witnesses testified as follows:

Plaintiff transcript, Page 6:

"I pulled up to the yardmaster's office, when the fireman said to me, 'John, try your injector, mine is not working sufficient'; I said 'alright.' I stopped the engine, put my injector on, she worked, and I tried the gauge cocks. I said to my fireman, 'Look, I'm got two gauges of water, try your injector.' He waited a

while, and finally got his on. I said, 'Is yours working?' He said 'yes.' "

Plaintiff transcript, Page 13:

"Q. You also spoke of working your injectors, explain what you mean by that.

"A. If you take the hot and cold water, and there is a primer, some have two, some have three, and some have one, you pull it to a certain distance until you hear the cold water run, and you pull it wide, and it puts all the cold water in. There are three little levers on the side of an injector. One is to leave the water in and one, the second one, is the primer, to get the steam out and cold water into the tank, and when that connects together the injector will give a different sound, to show that you have water. Then you turn the steam on, and that shoots it back into the boiler, and shoots this water up. You leave the one on the bottom set, and if your injector is not working right, giving too much water, they will put the water on the ground, and you have to raise that one up at least a little bit, which takes the water back in the boiler. That is an indication that you are wasting your water on the ground; you are putting it from the tank into the boiler. This injector that I had that night, I don't know whether it was a Monitor or what, when I put that injector on she started to lose the water out of what we call the overflow pipe. I looked out of the cab window, and cut down until she picked this water up and put it in the boiler, and I went to work and loaded these bananas."

"Q. When you examine the water, and think it is getting to a point where you should supply more water, you turn on these injectors?

"A. Yes, sir.

Plaintiff transcript, Page 14:

"The fireman told me his injector wasn't working right, to put my injector on. I stopped there fully ten minutes, with the engine on a level, tried the gauge cocks, and found two gauges of water. I asked the fireman to blow his glass out, did he blow his glass out, and he said, 'Yes, but it is not working properly, put your injector on.' My injector worked, and I

gave him chance to put his on, because his wasn't working right. By the time he got his injector working right I said, 'Is your water working?' and I said 'Yes.' I stood there for ten minutes, with both injectors working."

Plaintiff Transcript, Page 28:

"A. I saw him put his injector on. The boiler is between. I couldn't see from my side, you understand, because the injector is away up in the front of the cab, and the boiler is in the cab. I could hear it from my side, how it worked, but couldn't see him put it on.

"Q. You could hear it from your side?

"A. Yes, sir.

"Q. Before you went on boat, did fireman say anything to you about the water?

"A. About the water?

"Q. Yes.

"A. No, sir; I asked him did he have his injector on and he said, 'Yes,' and I went on the boat. When I pulled off the boat I tried my gauge cocks and I said 'There are two gauges of water, put the injector on.' At that time he said, 'My injector wont work, put yours on.' I stopped the engine then and put mine on. I tried my water and had two gauges of water. I stayed there fully ten minutes. Then he said to me, 'Mine is working straight now.' That gave him ample time. Sometimes you take these injectors and you work them that way and they will get warm and when they get too hot they are liable not to work. I put mine on to give him time to cool off a little bit, while mine cools off.' Then he blew his his working his was working and mine was working, too. Then I found the two gauges of water standing still and I proceeded to work again."

Plaintiff transcript, Page 29:

"A. He blew his glass out, tried his injector; then he told me, 'Put yours on while mines cools off.' Then he blew his glass out, and said his glass was not registering. I stopped and tried my gauge cocks, which is the safe part, and I found two gauges of water while I was standing there, giving him ample time to work his injector. While I was doing that he got his injector to work, with mine still

on. Then I asked him, 'Is your injector working?' and he said, 'Yes, mine is on.' Then I proceeded to finish that boat, that cut of cars, not to delay that boat.

"Q. After he ·told you that his injector was not working, did you stop the engine?

"A. Yes, sir.

"Q. How long did you stop?

"A. Fully ten minutes; I was there on the level."

Capdeville (switch foreman) transcript, Page 50:

"A. They (the injectors) were working when they pulled off the boat; you see I loaded the little side of the boat with five cars to go up, I heard the fireman put the injector on.

"Q. That was about how long before the explosion, do you think?

"A. I suppose about fifteen or twenty minutes."

Israel (the fireman) transcript, Page 62:

"A. He tried his gauge cocks and I put on my injector.

"Q. Did your injector work?

"A. It did.

"Q. When he tried his gauge cocks, what did he have?

"A. It sounded to me like two gauges of water, but I was on the other side of the engine. Then I put on my injector right away.

"Q. Did Mr. Burmaster put on his injector?

"A. Not then. He backed up to load the boat, pulled down on the outside and we were coming off the boat and I told Johnny, I said, 'You better put your injector on, Johnny, this injector looks like it's not putting much water in the boiler.' I don't know whether he got his injector on or was trying to put it on, but it wasn't no time after that that the explosion happened.

"Q. Then, while you were coming off the boat, you attempted to have your injector work and it wasn't working, is that what you said?

"A. No, it was working.

"Q. I thought you told Johnny your injector was not working?

"A. It was working, but the water wasn't going in my glass, you know. I was watching the overflow pipe, it wasn't losing any water, and I told Johnny he better put his on.

"Q. You say you had your injector working, but it wasn't working, it was not making any headway?

"A. Not in the water glass, no, sir."

Israel transcript, Page 64:

"Q. I don't mean to pin you down to minutes; just give us an idea.

"A. I put that injector on three or four times, and shut it off for a little while at a time. The boiler was full of water, and there wasn't any use of flooding it. I put it on a little while and shut it off and waited a little while and put it on again and shut it off."

Israel transcript, Page 69:

"Q. You put your injector on, after you blew the water glass out?

"A. Yes.

"Q. Nothing wrong with it?

"A. Apparently nothing wrong with it, you can tell if an injector is not working right; it will lose water through an overflow pipe.

"Q. Did you tell him to put his injector on at any time?

"A. After we were coming off the boat.

"Q. After you were coming off the boat, you told him to put his injector on?

"A. I asked him to put his on, yes.

"Q. Why did you ask him that, Mr. Israel?

"A. It looked like my injector wasn't bringing any water in the glass. That is all I had to go by, the glass. There are no gauge cocks on the left-hand side of the engine.

"Q. But there are on the engineer's side?

"A. Yes; the water wasn't picking up full in the water glass and I said, 'You better try to put your injector on; my injector don't look like it is filling her much.' "

It is thus seen that plaintiff testifies that the injector will give a different sound "to show that you have water,"

and "if the injector is giving too much water it will put water on the ground and you have to raise one up the least little bit, which takes the water back in the boiler."

He also swears that the water ran on the ground when he first put his injector on that night; that "he looked out of the cab window" and "cut it down until she picked up and put it in the boiler."

This evidence, far from showing that the injectors were not putting water in the boilers, tends to show that they were working properly and if they had not been, plaintiff would have known at once by the water overflowing on the ground.

Attorney for plaintiff, in his brief admits that defendants proved unquestionably by competent evidence that the injectors were working properly and the water glass was in good condition, when Engine 319 left the round house that morning on its fateful journey, but he argues that defendant was negligent in permitting Evans, the engine watchman, to take the engine to the boat and in permitting the yardmaster, Dawson, to take the engine off the boat. The evidence shows that it is against the rules of defendant company for a watchman or yardmaster to operate an engine, except in emergencies and there is no proof of an emergency here.

Still there is absolutely no proof that the handling of this engine by either Evans or Dawson had any casual connection with the accident and mere conjectures or suppositions are not sufficient.

Plaintiff's attorney admits in his brief that the injectors were working at frequent intervals during the entire time that engine operated, but he contends that the injectors must have been out

of order, because that is the only rational explanation of the accident which harmonizes and makes consistent all the evidence.

This contention is not tenable, for Robert Oswell, engine inspector, two years a machinist, testifies that he looked at the injectors shortly after the accident and they were both open and apparently working.

O'Connell, the master mechanic of the defendant company for ten years, says he saw the engine at 4 A. M. (about two hours after the accident), that both injectors were open and both appeared to be working; that in compliance with rules of Interstate Commission the cab was boarded up and engine kept statu quo for the government inspection four or five days later; that he then, under instructions from one of these inspectors, had a mechanic try these injectors on another engine of the same kind and they both worked perfectly.

After testifying that this engine could have been exploded in twenty or twenty-five minutes while removing cars from the yard to the ferry boat if the injectors were not properly used, he testifies as follows:

"Q. When a locomotive is filled up—I might refer to Charley Evans, he said he heard a whistle. What whistle is that, that whistles?

"A. Here is what I would say. He had that engine so full of water, away up above the three gauge cocks, and possibly he put his hand on the whistle lever, which would make a whistling noise. There is no occasion for filling the engine clean up to the whistle. In fact you couldn't work an engine that was so full of water. There would be no steam space if this engine was filled up with water that much.

"Q. If this engine was filled up with water, and put on the boat with 145 pounds of steam, such as Evans said it was filled up, and carried across the river,

how long would it take an engine, under those conditions, to have used up all that water above the gauge cocks?

"A. Well, if she wasn't in use, just transferred, and without being used, she would last two or three hours; but if she was put to work she would soon work all the water down. It would only take her a short while. You can burn an engine in fifteen minutes, especially an oil burning engine. The water can get away from you in twenty minutes. You can have two gauges of water, and fail to have water in the boiler, with an oil burner, which is the most severe heat you can put in a fire box, and get rid of all that water in a short time.

"Q. Was this an oil burning engine?
"A. Yes, sir. Coal won't do that."

Again on Page 115:

"Q. If, during those 15 or 20 minutes your injectors are working off and on, and one injector is working for five to seven minutes previous to the explosion, would you still say that a boiler would explode within 20 minutes?

"A. No, sir; I wouldn't that the water was low, if I knew that water was going into that boiler.

"Q. Then, if the water was low and the injector was working, what would you say about the injector?

"A. I would say maybe something was wrong with the injector and it wasn't putting any water in the boiler. I have had cases of obstructions at a particular time that would get into the house just ahead of the injector and that injector wouldn't put water in the boiler. I don't know that this occurred."

Now it will be recalled that Evans had testified that the steam would kick back in the tank or overflow if the water wasn't going into the boiler.

After the most careful examination of the record, we do not think that the evidence shows that the master mechanic's suppositions and explanation accords with the other facts in this case and we, therefore, hold that plaintiff has failed to show that the negligence of defendant was a contributing cause to this accident and as such showing is essential to recovery here (see cases referred to above and McCalmont vs. Pennsylvania R. Co., 273 Fed. 240, affirmed by C. C. A., 6th Circuit; Phillips vs. Pennsylvania R. Co., 283 Fed. 382 C. C. A., 7th Circuit; Penny vs. New Orleans Great Northern, 135 La., 962; Seaboard Air Line vs. Horton, 233 U. S., p. 501; Frese vs. Chicago B. & Q. R. Co., 263, U. S., 1-2; Lang vs. N. Y. C., 255 U. S., 455; L. & N. vs. Layton, 243 U. S., 617; Davis vs. Wolff, 263 U. S.) plaintiff's suit must be dismissed.

It is, therefore, ordered, adjudged and decreed that this suit be dismissed at plaintiff's cost.